FILED

2011 Apr-13  PM 03:49
U.S. DISTRICT COURT
N.D. OF ALABAMA



## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **ALABAMA POWER COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 6:10-CV-2454-SLB** |
| | ) | |
| **CHEVRON MINING INC., formerly** | ) | |
| **known as The Pittsburg & Midway** | ) | |
| **Coal Mining Co.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion to Dismiss.

(Doc. 7.)[1]  Plaintiff Alabama Power Company has sued defendant Chevron Mining Inc.,

seeking a declaratory judgment that the geological fault, identified by defendant in its Notice

of Force Majeure Event letter, is not a force majeure event under the parties' agreement, and

seeking damages for breach of contract, misrepresentation, suppression, and unjust

enrichment.  Defendant has moved to dismiss plaintiff's Complaint on the grounds that

plaintiff's claims are not ripe and plaintiff has failed to join a necessary, diversity-destroying

party.  Defendant also contends that this court should decline to exercise jurisdiction over the

declaratory judgment action based on a parallel state-court proceeding and dismiss this case.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion to Dismiss, (doc. 7), is due to be denied.

## I.  **MOTION TO DISMISS STANDARD**

Under Fed. R. Civ. P. 12(b)(1), a party may move the court to dismiss a case if the court lacks jurisdiction over the subject matter of the case.  Plaintiff, as the party invoking jurisdiction, bears the burden of establishing the court's subject matter jurisdiction.  *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir.1994).

Attacks on subject matter jurisdiction under Rule 12(b)(1) occur in two forms:  facial attacks and factual attacks.  *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990); *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 731 (11th Cir. 1982).  "'Facial attacks' on the complaint require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true." *McMaster v. United States*, 177 F.3d 936, 940 (11th Cir. 1999)(quoting *Lawrence*, 919 F.2d at 1528-29).  Therefore, "when faced with a 12(b)(1) challenge to the face of a complaint, the plaintiff can survive the motion by showing any arguable basis in law for the claim made." *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996).  "Factual attacks, on the other hand, challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as

testimony and affidavits, are considered.'" *Cook Oil Co., Inc. v. United States*, 919 F. Supp.

1556, 1559 (M.D. Ala. 1996)(quoting *Lawrence*, 919 F.2d at 1529).

Defendant's challenge to the court's subject matter jurisdiction in a facial challenge.

## II.  STATEMENT OF FACTS

Because defendant's challenge to the court's subject matter jurisdiction is a facial

challenge, the court assumes the facts alleged in plaintiff's complaint are true.  In its

Complaint, plaintiff alleged the following facts:

> 7.  On August 4, 1998, Alabama Power and Chevron Mining entered
> into the Agreement, whereby Chevron Mining agreed to mine and sell coal to
> Alabama Power, and Alabama Power agreed to purchase coal from Chevron
> Mining, under certain terms and conditions as set forth in the Agreement.
>
> 8.  The Agreement requires that Chevron Mining supply to Alabama
> Power, and that Alabama Power purchase from Chevron Mining, specific
> amounts of coal (expressed in annual tonnage delivery requirements) each year
> commencing in 2000 and continuing through 2013.  Additionally, Alabama
> Power has the right of first refusal to purchase additional tons of coal produced
> from the North River Mine up to a specific amount in any one or more contract
> years and in 2014.  Time is of the essence under the Agreement.
>
> 9.   With respect to Chevron Mining's annual tonnage delivery
> requirements, the Agreement includes representations and warranties by
> Chevron Mining that, to the best of its knowledge, "the North River Property
> contains economically recoverable coal of a quality and in quantities which,
> under present mining laws and practices, are sufficient to satisfy the
> requirements of this Agreement."  Further, Chevron Mining warrants in the
> Agreement that during its term, Chevron Mining "will not permit the
> disposition of coal from the North River Property to be made to any person or
> persons other that [Alabama Power,] except to the extent that it may do so
> without reducing the economically recoverable balance of coal in the North
> River Property to an amount less than the amount remaining to be supplied to
> [Alabama Power] hereunder."

10.  Since entering into the Agreement in 1998, the Agreement has been amended on seven separate occasions, including most recently on January 1, 2010.

11.  The Agreement originally was scheduled to expire at midnight on December 31, 2007.

12.  On January 1, 2005, the Agreement was amended.  The January 1, 2005 amendment extended Chevron Mining's obligations to supply, and Alabama Power's obligations to purchase, coal from the North River Mine through and including 2013.

13.  Beginning in or near 2006, and continuing through 2008, Chevron Mining failed to meet its annual tonnage delivery requirements under the Agreement by failing to timely deliver the specified quantity of coal in each contract year.  This failure resulted in a delivery shortfall of approximately 750,000 tons of coal.

14.  As a result of Chevron Mining' failure to meet its annual tonnage delivery requirements from 2006 through 2008, Alabama Power was forced to purchase coal at market to meet its coal requirements at its plants.  As a result, Alabama Power suffered damages.

15.  In 2007 and 2008, Alabama Power and Chevron Mining had a series of negotiations that ultimately culminated in a November 1, 2008 amendment to the Agreement.  These negotiations concerned how Chevron Mining would address the delivery schedule for the shortage of coal that it had failed to timely deliver under the Agreement; Alabama Power's decreased need for North River Mine coal at Alabama Power's E.C. Gaston Plant in 2009, and Chevron Mining's request for permission from Alabama Power for Chevron Mining to supply specific quantities of coal from the North River Mine to another coal purchaser, PowerSouth Energy Cooperative ("PowerSouth"), for the years 2009 through 2012.

16.  On November 1, 2008, the Agreement was amended.  The November 1, 2008 amendment deferred delivery of a significant portion of Chevron Mining's annual tonnage delivery requirements to 2013.  The November 1, 2008 amendment also provided, in part, that Alabama Power's right of first refusal to purchase additional quantities of coal during each contract year and in 2014 applied to coal produced in excess of certain

amounts, including, but not limited to, Chevron Mining's annual coal tonnage commitments to PowerSouth for the years 2009 through 2012.

17. On January 1, 2010, the Agreement was amended. The January 1, 2010 amendment deferred delivery of additional tons of coal into the future.

18. On August 13, 2010, Chevron Mining wrote to the Vice President of Fuel Services of Southern Company Services, Inc., agent for Alabama Power, a letter declaring a "Notice of Force Majeure Event." In particular, the August 13, 2010 letter advised Alabama Power that "the North River Mine has experienced a force majeure event that prevents CMI's [Chevron Mining's] ability to mine and deliver coal, and ultimately to meet the total contractual tonnage commitment under the Agreement." The letter further stated:

> CMI has encountered an unforeseen geologic anomaly in the development of the second panel out. This anomaly appears to be a shear plane fault with a vertical displacement of at least 18 feet, resulting in our inability to proceed with mining north of this fault zone. Although CMI is not yet in a position to fully quantify the effect of this fault, CMI is working to determine both the timing and the amount of tons that will be impacted. However, at present the Flat Creek reserve appears to be negatively impacted by approximately 850,000 tons.

[Doc. 2 at 2.]

19. Chevron Mining now claims that the projected 850,000 ton shortfall will prevent Chevron Mining from meeting its supply obligations under the Agreement; some in 2012, but mostly in 2013 and possibly into 2014.

20. The geological fault identified by Chevron Mining in its August 13, 2010 Notice of Force Majeure Event Letter is not a force majeure event under the Agreement. Chevron Mining knew or should have known the full extent of the fault at least as early as 2007, prior to entering into the November 1, 2008 and January 1, 2010 amendments. The geological fault was known and foreseeable to Chevron Mining, and upon information and belief, does not prevent Chevron Mining from meeting its obligations under the Agreement. The geological fault does not excuse Chevron Mining from performance under the Agreement.

21.  Chevron Mining's act of invoking the force majeure provisions of the Agreement due to the geological fault described in its August 13, 2010 Notice of Force Majeure Event letter has an immediate adverse impact on Alabama Power, by diminishing the value of the Agreement, and requires, at a minimum, that Alabama Power make alternative arrangements to obtain more expensive replacement coal of the grade and quality required under the Agreement.

. . .

22.  The geological fault identified by Chevron Mining in is August 13, 2010 Notice of Force Majeure Event letter was known to Chevron Mining at least as early as 2007.

23.  At least as early as 2007, prior to entering into the November 1, 2008 and January 1, 2010 amendments deferring significant portions of Chevron Mining's annual tonnage delivery requirements to 2013, Chevron Mining knew of the geological fault in the Flat Creek area of the North River Mine, which adversely impacted the mining and production of the known coal seam.  Further, Chevron Mining knew or should have known the full extent of faulting in the Flat Creek area of the North River Mine and its effect on Chevron Mining's ability to meet its annual tonnage delivery requirements to Alabama Power under the Agreement.  Notwithstanding this knowledge, Chevron Mining represented to Alabama Power that "total production in any impacted year should remain stable" and that any loss of reserve from faulting could be recovered.  Chevron Mining lead Alabama Power to believe that, despite what Chevron considered to be "potential significant faulting," that Chevron Mining would meet its existing commitments and additional tonnage delivery commitments in future contract years.

24.  Alabama Power relied on Chevron Mining's representations to Alabama Power's detriment.  Among other things, Alabama Power entered into the November 1, 2008 amendment, agreeing to allow Chevron Mining to defer to 2013 Chevron Mining's delivery of the approximately 750,000 ton shortage that accumulated from 2006 through 2008, thereby foregoing certain of Alabama Power's rights under the Agreement arising from the failure to deliver the contractually required tonnage.  Further, Alabama Power provided permission to Chevron Mining for it to contract to supply coal from the North River Mine to PowerSouth.

25. Chevron Mining induced Alabama Power to agree to allow some of the coal tonnage that Alabama Power had the right to purchase under the Agreement to be sold instead to PowerSouth.  Had Alabama Power known then that Chevron Mining subsequently would seek to excuse its performance of its coal delivery obligations under the Agreement through the invocation of the force majeure clause, Alabama Power would not have agreed to allow the PowerSouth coal contract in its present form and under the circumstances existing at that time.

26. Upon information and belief, Chevron Mining entered into its contract with PowerSouth on April 8, 2008, and has supplied and is continuing to supply coal to PowerSouth from the North River Mine.  The coal supplied to PowerSouth, and to be supplied in the future, is coal that otherwise is or would have been available to Alabama Power to satisfy Chevron Mining's commitments to Alabama Power that Chevron Mining is now seeking to have excused on the basis of force majeure.

27. Alabama Power has suffered damage as a result of its reliance on Chevron Mining's misrepresentations and suppressions concerning the geological conditions of the fault that it now claims is a force majeure event, and the significance and probable consequences of those conditions.

(Doc. 1 ¶¶ 7-27 [footnote omitted].)

### III. DISCUSSION

Defendant has moved to dismiss plaintiff's Complaint on the grounds that plaintiff's claims are not ripe and plaintiff has failed to join a necessary, diversity-destroying party. (Doc. 7 at 2.)  Defendant also contends that this court should decline to exercise jurisdiction over the declaratory judgment action based on a parallel state-court proceeding and dismiss this case.  (*Id*.)  For the reasons set forth below, the court finds that defendant's Motion to Dismiss is due to be denied.

## A.  RIPENESS

The Supreme Court has held:

> Our decisions have required that the dispute be "definite and concrete, touching the legal relations of parties having adverse legal interests"; and that it be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." [*Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240-241, 57 S. Ct. 461, 464 (1937)].  In *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed.  826 (1941), we summarized as follows:  "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).  Plaintiff's Complaint alleges five claims for relief:  (1) declaratory judgment, (2) breach of contract, (3) negligent, innocent, reckless, and/or intentional misrepresentation, (4) suppression, and (5) unjust enrichment.

### 1.  Declaratory Relief

Defendant contends that plaintiff's claim for declaratory relief is not ripe because, "Alabama Power's Complaint does not allege that Chevron Mining has failed to make any deliveries of coal as a result of the *force majeure*, nor is there any allegation that there is even an immediate threat that such will occur."  (Doc. 7 at 8.)  Defendant argues that plaintiff should have "respond[ed] to the letter [declaring a *force majeure* event] or wait[ed] for information about the timing or total impact of the coal to be delivered" before filing this lawsuit, and that "the surrounding facts" are not "sufficiently developed to enable a court to

provide . . . specific relief through a decree of a conclusive character." (*Id*. at 9 [internal quotations omitted].)

The dispute between the parties regarding whether the geologic fault is a *force majeure* event under the terms of the parties' agreement is ripe.  By sending the Notice of Force Majeure Event, defendant created a real and substantial dispute between the parties as to whether the geologic fault is a *force majeure* event.  Plaintiff's Complaint alleges that the fault cannot be a force majeure event because defendant knew about the fault before entering into amendments to the parties' agreements.  Also, according to the Complaint, an estimated 850,000 tons of coal are "negatively impacted" by the fault and, therefore, defendant will be prevented from meeting its obligations in 2012, 2013, and 2014.  (Doc. 1 ¶ 19.)  The dispute affects the relationship between the parties under the agreement.  If the fault is a *force majeure* event, defendant's obligations under the agreement are "suspended to the extent made necessary by and during the continuance of such force majeure."  If the fault is not a *force majeure* event, defendant must meet its obligations under the agreement.

The issue is whether a geologic fault, the existence and extent of which defendant is alleged to have prior knowledge, can be a *force majeure* event.  This type of dispute is amenable to resolution by declaratory judgment.  Therefore, the court finds that plaintiff's request for declaratory relief is ripe.

## 2. Suppression and Misrepresentation

Plaintiff's claims based on suppression and misrepresentation are ripe also.  Plaintiff contends that defendant misrepresented the amount of coal capable of being mined at the North River Mine and/or suppressed the existence and extent of the fault in order to have plaintiff enter into two subsequent amendments to the parties' agreement – allowing defendant to sell coal from the North River Mine to PowerSouth and deferring recoupment of production shortfalls in 2006-2008 to 2013 and 2014.  Assuming, as the Complaint alleges, that defendant negotiated these amendments without informing plaintiff of the existence/extent of the geologic fault, the parties' dispute is definite and concrete and touches on the legal relationship between the parties.  Moreover, the court can provide specific relief to plaintiff through money damages.

Therefore, the court finds plaintiff's claims of suppression and misrepresentation are ripe.

## 3. Breach of Contract

Plaintiff's breach of contract claim is also ripe.  Plaintiff alleges that defendant breached the agreement by sending the improper Notice of Force Majeure Event and by "refus[ing] to acknowledge or fulfill fully its obligations" under the agreement. (Doc. 1 ¶ 37.)  The Complaint alleged facts sufficient to state a claim based on repudiation or anticipatory breach of the parties agreement.

"It is well settled that once a party to a contract materially breaches the contract by repudiating the parties' agreement, the other party is excused from performance and has an immediate cause of action for the breach." *Baldwin v. Panetta*, 4 So. 3d 555, 562 (Ala. Civ. App. 2008)(citing *Federal Ins. Co. v. I. Kruger, Inc.*, 829 So. 2d 732, 737 (Ala. 2002)). Sending the Notice of Force Majeure Event in August 2010, when, according to the Complaint, defendant had notice of the existence and extent of the fault prior to amending the parties' agreement, may constitute a repudiation or anticipatory breach. *See Shirley v. Lin*, 548 So. 2d 1329, 1334 (Ala.1989)("To amount to a renunciation, . . . the evidence must show words or acts evincing *an intention to refuse performance* within the future time allowed by the contract," and "[s]ome authorities state that the repudiation by one party must at least amount to an *unqualified refusal,* or declaration of inability, substantially to perform according to the terms of his obligation.")(emphasis in original; internal quotations omitted). Based on the allegations in the Complaint and for purposes of determining whether the dispute is ripe, the court assumes the Notice of Force Majeure Event was a repudiation of the parties' agreement.

Thus, the court finds that plaintiff's breach-of-contract claim is also ripe.

### 4.  Unjust Enrichment

Plaintiff's Complaint alleges, "In the event this Court determines that [defendant] has properly invoked force majeure, [plaintiff] claims in the alternative that [defendant] has been unjustly enriched. [Plaintiff] seeks recovery of the amounts to which it was entitled for

11

[defendant's] failure to timely deliver approximately 750,000 tons of coal to [plaintiff]."

(Doc. 1 ¶ 54.)   According to plaintiff's Complaint, defendant "failed to meet its annual

tonnage delivery requirements under the Agreement " in 2006 through 2008, and, as a result,

defendant failed to deliver approximately 750,000 tons of coal." (Doc. 1 ¶ 13.)  As a result

of this shortage, plaintiff and defendant amended their Agreement to allow defendant to

postpone delivery of the shortage until sometime in the future, (*id*. ¶¶ 16-17), and did not

seek to enforce the terms of the original agreement.  Plaintiff claims that it entered into the

amendments because defendant suppressed and/or misrepresented the fact that it would not

be able to deliver the coal in the future due to the geologic fault.  (*Id*. ¶¶ 41, 51.)

Plaintiff's claim for unjust enrichment is derivative of its claims of misrepresentation

and suppression. *See Dickinson v. Cosmos Broadcasting Co., Inc.*, 782 So. 2d 260, 266 (Ala.

2000).   Therefore, for the reasons set forth above, the court finds that plaintiff's unjust-

enrichment claim is ripe.

Defendant's Motion to Dismiss plaintiff's Complaint on ripeness grounds is due to

be denied.

## B.  DIVERSITY JURISDICTION

"For federal diversity jurisdiction to attach, all parties must be completely diverse and

the amount in controversy must exceed $75,000."  *Underwriters at Lloyd's, London v.

Osting-Schwinn*, 613 F.3d 1079, 1085-86 (11th Cir. 2010)(citing, *inter alia*, 28 U.S.C. §

1332(a))(internal citations and footnotes omitted).  Defendant contends that plaintiff cannot

establish subject matter jurisdiction based on diversity of citizenship because it has not

established the requisite amount in controversy.

### 1. Diverse Citizenship

Plaintiff alleges it is an Alabama corporation and that defendant is a Missouri

corporation with its principal place of business in Colorado.  (Doc. 1 ¶¶ 2-3.)  Defendant

contends that PowerSouth, an Alabama resident corporation, is a party that must be joined

and, if joined, would destroy diversity.  It contends:

> Alabama Power seeks to have this court require Chevron Mining to provide all the coal required under the Alabama Power Agreement.  Such an order could impact Chevron Mining's ability to provide coal to PowerSouth. That is, any determination by this Court of Alabama Power's rights under its Agreement with Chevron Mining could prejudice PowerSouth's rights under its Agreement with Chevron Mining.  In the event Chevron Mining is unable to provide to PowerSouth the coal that is contractually required because of relief awarded through this lawsuit, PowerSouth likely would file its own action against Chevron Mining.  This would lead to duplicative litigation involving the same coal reserves and similar contractual issues. Consequently, PowerSouth is clearly a required party to the extent Alabama Power's claims are permitted to proceed.

(Doc. 7 at 23.)

"Rule 19 states a two-part test for determining whether a party is indispensable.  First,

the court must ascertain under the standards of Rule 19(a) whether the person in question is

one who should be joined if feasible," referred to in Rule 19(a) as a "required party."

*Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc.*, 669 F.2d 667, 669 (11th Cir. 1982);

Fed. R. Civ. P. 19(a).  "If the person should be joined but cannot be (because, for example,

joinder would divest the court of jurisdiction) then the court must inquire whether, applying

the factors enumerated in Rule 19(b), the litigation may continue." *Challenge Homes*, 669

F.2d at 669.

Rule 19(a) provides:

(1)  Required Party.  A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A)  in that person's absence, the court cannot accord complete relief among existing parties; or

(B)  that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(I)  as a practical matter impair or impede the person's ability to protect the interest; or

(ii)  leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a).

Plaintiff alleges that it would not have entered into the amended agreements, which

allow defendant to provide PowerSouth with coal and to defer delivery of past shortages to

some time in the future, had it known that, because of the geologic fault, sufficient coal

would not be available in the future.  Plaintiff's Complaint does not seek to change the

relationship between defendant and PowerSouth or otherwise divert coal shipments from

PowerSouth to plaintiff.[2]  A decision in this case will not impair or impede PowerSouth's

ability to protect its interests or subject defendant to inconsistent obligations.

Therefore, the court finds that PowerSouth is not a required party under Rule 19(a)

and its citizenship is irrelevant for purposes of establishing the court's subject-matter

jurisdiction.

### 2.  Jurisdictional Amount

Defendant contends that plaintiff has not adequately alleged an amount in controversy

exceeding $75,000.  However, the Notice of Force Majeure Event states that the fault appears

to have "negatively impacted [the Flat Creek Reserve] by 850,000 tons."  Plaintiff contends

that defendant is responsible for the cost and expenses of procuring replacement coal.  If the

cost of replacement coal is $.10 more per ton than the price the parties' per ton price, the

replacement cost exceeds $75,000.  Plaintiff has satisfied the jurisdictional amount.

For the foregoing reasons, the court finds that defendant's Motion to Dismiss based

on a lack of diversity jurisdiction is due to be denied.

## C.  WILTON-BRILLHART ABSTENTION

As an alternative to dismissal, defendant asks the court to "exercise its discretion

under the federal Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, to decline to hear

---

[2]For example, plaintiff seeks money damages for the costs of securing replacement
coal; it also seeks money damages in the amount that defendant "has been unjustly enriched
by its sale of coal to PowerSouth at a greater price than the price required by its contract with
[plaintiff]." (Doc. 1 ¶¶ 38-39, 54-55.)  It does not seek any specific relief affecting the legal
relationship between defendant and PowerSouth.

this suit in light of the parallel Fayette County action," pursuant to the *Wilton/Brillhart*

doctrine,[3] as followed by the Eleventh Circuit in *Ameritas Variable Life Ins. Co. v. Roach*,

411 F.3d 1328 (11th Cir. 2005).  (Doc. 7 at 2, 13-14.)  The Eleventh Circuit has held:

> The Declaratory Judgment Act is an enabling Act, which confers a
> discretion on courts rather than an absolute right upon the litigant.  It only
> gives the federal courts competence to make a declaration of rights; it does not
> impose a duty to do so.  In fact . . ., the Supreme Court has expressed that it
> would be uneconomical as well as vexatious for a federal court to proceed in
> a declaratory judgment suit where another suit is pending in a state court
> presenting the ***same issues***, ***not governed by federal law***, between the ***same
> parties***.  The Supreme Court has warned that gratuitous interference with the
> orderly and comprehensive disposition of a state court litigation should be
> avoided.  This warning should be heeded.

*Ameritas Variable Life Ins. Co.*, 411 F.3d at 1330 (quoting *Wilton*, 515 U.S. at 287; citing

and quoting *Brillhart*, 316 U.S. at 494-95)(internal citations and quotations omitted;

emphasis added).  According to the Eleventh Circuit, the district court should consider

*Wilton/Brillhart* abstention ***only*** "in the face of parallel litigation in the state courts" – that

is when "another suit is pending in a state court presenting the same issues, not governed by

federal law, between the same parties."  *Id*. at 1330-31; *see also Specialty Underwriters

Alliance v. Peebles McManus L.L.C.*, 643 F. Supp. 2d 1298, 1301 (M.D. Ala. 2009).

Therefore, the court's first inquiry is whether the Fayette County action presents the same

state-law issues between the same parties.

---

[3] *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995); *Brillhart v. Excess Ins. Co.*, 316 U.S.
491 (1942).

Defendant filed the state-court action against plaintiff, as well as against Georgia Power Company, Southern Company Services, and the Southern Company, in the Circuit Court of Fayette County, Alabama on August 17, 2010. (Doc. 7-2 at 10.) In its Complaint, defendant contends that plaintiff and the other defendants in the Fayette County action "have refused to accept significant adjustment claims," which change the agreed-upon price per ton of coal pursuant to provision in the parties' agreement. (*Id*. at 16-18.) Defendant also alleges that plaintiff and the other defendants in the Fayette County action "conspired to act in concert to cause damage to Chevron Mining by intentionally breaching or intentionally interfering with the coal sales agreements." (*Id*. at 20.)

The court finds these issues are not the same as the issues raised in the instant action, which concerns whether the geologic fault is a force majeure event, whether defendant breached the parties' agreement by sending Notice of Force Majeure event, and whether defendant misrepresented and/or suppressed information regarding the geologic fault in order to induce plaintiff to enter into amendments to the parties' agreement. The issues in this case are not the same as the issues in the Fayette County action.[4]

---

[4]Defendant appears to contend that the actions are parallel because plaintiff's claims in this case are compulsory counterclaims in the Fayette County action. Plaintiff's claims in this case are not compulsory counterclaims.

Under Rule 13(a), Ala. R. Civ. P., a compulsory counterclaim "shall" be asserted "against any opposing party." "'A counterclaim is compulsory if there is any logical relation of any sort between the original claim and the counterclaim.'" *Ex parte Water Works & Sewer Bd. of Birmingham*, 738 So. 2d 783, 789 (Ala. 1998)(emphasis added)(quoting Rule 13, Ala. R. Civ. P.,

Therefore, defendant's Motion to Dismiss based on *Wilton/Brillhart* doctrine is due to be dismissed.

## **CONCLUSION**

For the foregoing reasons, the court is of the opinion that the matter is ripe, the court has diversity subject-matter jurisdiction, and it is not compelled to abstain under the *Wilton/Brillhart* doctrine.  An Order denying defendant's Motion to Dismiss, (doc. 7), will be entered contemporaneously with this Memorandum Opinion.

---

Committee Comments).   Under that principle, "'a counterclaim [i]s compulsory if (1) its trial in the original action would avoid substantial duplication of effort or (2) the original claim and the counterclaim arose out of the same aggregate core of operative facts.'" *Ex parte Water Works & Sewer Bd.*, 738 So. 2d at 789 (quoting *Brooks v. Peoples Nat'l Bank*, 414 So. 2d 917, 919 (Ala. 1982)).   "'[C]laims arise from the same core of operative facts if (1) the facts taken as a whole serve as the basis for both claims or (2) the sum total of facts upon which the original claim rests creates legal rights in a party which would otherwise remain dormant.'"   738 So. 2d at 789 (quoting *Brooks*, 414 So. 2d at 919).

*Kaufmann & Associates, Inc. v. Davis*, 908 So. 2d 246, 253 (Ala. Civ. App. 2004), *cert. denied* (Ala. 2005).

Determining whether defendant was entitled to an adjustment of the price based on federal regulation will not decide whether the geologic fault is a force majeure event and whether defendant concealed or misrepresented the existence and/or extent of the fault.  The evidence required to decide these issues, with the exception of the agreement, will not be the same.  Plaintiff's claims in this action are not compulsory counterclaims in the Fayette County action.

**DONE**, this 13th day of April, 2011.

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE